IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 6, 2023 Session

**STATE OF TENNESSEE v. KEENAN A. MURPHY**

**Appeal from the Circuit Court for Madison County**
**No. 20-382        Kyle C. Atkins, Judge**

_____

**No. W2022-01108-CCA-R3-CD**
_____

A Madison County jury convicted the Defendant, Keenan A. Murphy, of first degree murder and attempted first degree murder. The trial court sentenced the Defendant to an effective sentence of life imprisonment plus twenty-six years. On appeal, the Defendant argues that the proof is insufficient to support the convictions because the State failed to prove premeditation. The Defendant also asserts that the trial court committed plain error by allowing the State to cross-examine the defense expert about a second shooting the Defendant committed nine days after the offenses in this case. On our review, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Mitchell A. Raines, Assistant Public Defender, Tennessee District Public Defenders Conference (on appeal), and Jeremy Brent Epperson, District Public Defender, and John D. Hamilton, Assistant Public Defender (at trial), for the appellant, Keenan A. Murphy.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley F. Champine and Alfred L. Earls, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

As is relevant to this appeal, a Madison County grand jury charged the Defendant with the offenses of first degree murder, attempted first degree murder, aggravated assault,

and employment of a firearm during the attempted commission of a dangerous offense. The charges originated from a shooting that occurred in September 2019, killing Mr. Julio Almaraz and causing serious bodily injury to Mr. Joe Ramirez. The trial in this matter started on December 15, 2021.

## FACTUAL BACKGROUND

### A.    SEPTEMBER 2019 SHOOTINGS

On September 25, 2019, the Defendant contacted his friend, Mr. Joe Ramirez, on Facebook about purchasing a .40 caliber Glock. The Defendant and Mr. Ramirez had known each other for about seven years and grew up playing basketball in the same neighborhood. After agreeing to sell the firearm, Mr. Ramirez and another friend, Mr. Julio Almaraz, drove to meet the Defendant at the Scottish Inns in Jackson, Tennessee. At the Scottish Inns, the Defendant paid Mr. Ramirez $460, and Mr. Ramirez gave the Defendant the Glock. After the exchange, the Defendant asked the men to drive him to his grandmother's house, and he gave Mr. Almaraz gas money.

When the trio left the Scottish Inns, Mr. Almaraz was driving, Mr. Ramirez was seated in the passenger seat, and the Defendant was sitting in the backseat on the driver's side. Mr. Ramirez testified that the Defendant "seemed calm, just normal," and he did not notice anything "out of the ordinary." Following the Defendant's directions, Mr. Almaraz drove toward Lane College in southeast Jackson. About ten to fifteen minutes into the drive, Mr. Ramirez noticed that the directions the Defendant provided were taking them in circles, and he began to "notice something was up."

The Defendant asked Mr. Almaraz to stop in front of a house on Middleton Street that looked vacant. Moments later, the Defendant shot both Mr. Ramirez and Mr. Almaraz. Mr. Almaraz slumped over the steering wheel, and the car rolled into an embankment. Mr. Ramirez briefly lost consciousness, and when he woke, the Defendant was already gone. Mr. Ramirez then called 911 for help. Mr. Ramirez survived, but Mr. Almaraz died about two weeks later because of complications from the gunshot wound.

The Defendant was later arrested on October 4, 2019, while law enforcement officers were investigating an unrelated shooting involving the Defendant. In an interview following the Defendant's arrest, the Defendant initially denied any involvement in the crimes. After being confronted with other evidence, however, the Defendant admitted that he shot both Mr. Almaraz and Mr. Ramirez. According to the testimony of a police investigator, when asked for a reason for the shootings, the Defendant said that "[t]he best he could ever give was that Joe Ramirez was challenging his manhood . . . and that that

2

had upset him." The Defendant also said that he shot Mr. Almaraz because he "couldn't leave a witness."

**B.     EXPERT TESTIMONY**

Before trial, the Defendant filed a Notice of Insanity/Diminished Capacity Defense and Intent to use Expert Testimony. The trial court granted the State's request for a forensic evaluation, and Dr. Sophia Fouche evaluated the Defendant at Pathways Behavioral Health Services. Additionally, the State filed a motion in limine to determine whether the testimony of the defense expert, Dr. Keith Caruso, was admissible.

During the hearing on the motion, the State examined Dr. Caruso. Dr. Caruso testified that the Defendant could not have formed the premeditation necessary for the crimes because the Defendant was in a manic episode caused by Bipolar I disorder. Dr. Caruso testified as to the information that he relied upon in forming his opinion, including, among other things, the subsequent October 4 shooting also involving the Defendant (hereinafter "October Shooting").

After the hearing, the trial court determined that Dr. Caruso would be permitted to testify about whether the Defendant's suffering from Bipolar I disorder prevented him from being able to form premeditation. The State made clear that it planned to cross-examine Dr. Caruso on whether he considered the October Shooting in reaching his opinion that the Defendant was in a manic episode when the earlier shootings occurred in September. The State argued that if Dr. Caruso testified about the information he relied upon to reach his opinion, the State should be permitted to cross-examine him about that information, including the October Shooting. The trial court declined to rule immediately on this issue but instead deferred the question until after Dr. Caruso testified on direct examination.

### 1.     Direct Examination of Defense Expert

At trial, Dr. Caruso testified that he was a board-certified general and forensic psychiatrist, and the trial court recognized him as an expert in forensic psychiatry. Dr. Caruso said that he evaluated the Defendant before the trial. This evaluation involved interviewing the Defendant and his mother, as well as reviewing pertinent records, including but not limited to "police reports, the videos of [the Defendant's] statements, the photos associated with th[e] case, TBI records, autopsy records" as well as other videos of witness interviews, and prior mental health treatment records, as well as the report from the State's forensic psychiatrist.

3

Based on his evaluation, Dr. Caruso concluded that the Defendant was suffering from "Bipolar I disorder, most recent episode manic with mixed features." Dr. Caruso explained that these episodes with "mixed features" were either a manic episode in which the Defendant experienced depressive symptoms or a depressive episode in which the Defendant also experienced manic symptoms. Dr. Caruso confirmed that he relied upon the criteria in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-V") in reaching his conclusion regarding the Defendant's Bipolar I disorder diagnosis.

Further, Dr. Caruso testified with a reasonable degree of medical certainty that Bipolar I disorder was a serious mental illness. In Dr. Caruso's opinion, this serious mental illness precluded the Defendant from being able to form the required mental state to premeditate the offenses of first degree murder or attempted first degree murder. He opined that the Defendant was acting in a way that demonstrated an inability to plan due to his mania. Dr. Caruso felt that the Defendant's manic state was so severe that he could not act in the absence of passion and excitement.

## 2. Jury-Out Hearing

After Dr. Caruso's direct examination testimony, the trial court held a hearing outside the jury's presence regarding the anticipated scope of the State's cross-examination. The State noted that the Defendant had asked Dr. Caruso about some of the information he considered in reaching his conclusion about the Defendant's ability to form premeditation. Pursuant to Tennessee Rule of Evidence 705, the State argued that it must be permitted to question him about the *other* information Dr. Caruso considered, including the fact of the October Shooting. Citing *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), the State asserted that it could cross-examine a defense expert about other-act evidence considered by that expert subject to the requirements of Tennessee Rule of Evidence 404(b).

The trial court agreed and analyzed the issue under Rule 404(b). The court first found that the testimony was relevant to "the mens rea issue and whether or not the defendant has the requisite ability to form the mental intent necessary to constitute the offense." The trial court also found the October Shooting was established by clear and convincing evidence because the Defendant had been arrested near the scene of the offense with the firearm that had been used to commit the offense and that the Defendant had admitted to the offenses. Finally, the trial court concluded the probative value of the evidence was greater than any risk of undue prejudice, in part, because Dr. Caruso had considered the October Shooting in reaching his conclusions. As the trial court observed, "I just don't see how we can get to a fair and just resolution of the mens rea issue without the entire facts and circumstances the doctor used to make his opinion." The parties agreed

4

to a limiting instruction that the jury could consider the October Shooting only as to whether "the defendant had the requisite mental state to commit the crime."

### 3. Cross-Examination of Defense Expert

During cross-examination, Dr. Caruso testified that he was aware the Defendant was arrested and charged following the October Shooting. He also confirmed that the facts of the October Shooting were "almost identical" to the shootings in this case. However, Dr. Caruso testified that the Defendant was suffering from one continuous manic episode and that the manic episode prevented the Defendant from being able to premeditate or plan his actions. While the State expressed skepticism that the Defendant could remain in a manic state over the nine days separating the two shootings, Dr. Caruso explained that "[a] nine-day manic episode is not unusual[.]" On redirect examination, Dr. Caruso stated that he had seen long manic episodes in his own patients "numerous times."

### 4. State's Rebuttal Expert

In the State's rebuttal, Dr. Sophia Fouche, a clinical psychologist at Pathways Behavioral Health System, was admitted as an expert in clinical and forensic psychology. Dr. Fouche testified that she was ordered by the trial court to complete a forensic evaluation of the Defendant and that she performed the evaluation in November 2019. In conducting her evaluation, she relied upon her interview with the Defendant, along with her review of the Defendant's court file, treatment records, and his interview with law enforcement in October 2019.

Dr. Fouche detailed the Defendant's treatment history at Pathways for the jury, which included his 2016 diagnoses for generalized anxiety disorder, major depressive disorder, other hallucinogenic use disorder, and post-traumatic stress disorder. Disagreeing with Dr. Caruso, Dr. Fouche testified that the Defendant was not suffering from undiagnosed Bipolar I disorder in 2019. Instead, Dr. Fouche opined that the Defendant suffered from generalized anxiety disorder and major depressive disorder.

Ultimately, Dr. Fouche concluded that the Defendant did not lack the capacity to form premeditation at the time of the September 25, 2019 shootings. She noted that the Defendant told her that his state of mind on that day was "calm, cool, and collected." Further, Dr. Fouche observed that his demeanor during his October 2019 interview with law enforcement was consistent with that description.

## C.   JUDGMENT, SENTENCING, AND APPEAL

The jury found the Defendant guilty on all charges.[1]  Following a sentencing hearing on February 23, 2022, the trial court sentenced the Defendant as a Range I, standard offender to an effective sentence of life imprisonment plus twenty-six years.   The judgments were entered on March 16, 2022.

The Defendant filed an untimely motion for a new trial on May 8, 2022, which was later withdrawn on September 27, 2022.  Although the Defendant filed his notice of appeal late on August 15, 2022, this Court later waived the timely filing requirement and found that the interest of justice permitted this case to proceed.  *See* Tenn. R. App. P. 4(a).

## ANALYSIS

## A.   LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence presented at trial is insufficient to support his convictions for first degree murder and attempted first degree murder.  He asserts that the State failed to prove that either offense was committed with premeditation. Specifically, the Defendant contends that given Dr. Caruso's testimony that he had a severe mental disorder and that this disorder precluded him from being able to form premeditation, no reasonable juror could have rendered a guilty verdict.  The State responds that the Defendant acknowledges that he shot both victims.  The State further asserts that the jury resolved any conflicts between the differing opinions of Dr. Caruso and Dr. Fouche on whether the Defendant could form premeditation.  We agree with the State.

### 1.   Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   This standard of review is "highly deferential" in favor of the jury's verdict.  *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023).  Indeed, this standard requires us to resolve all conflicts in favor of the State's theory

---

[1]   The Defendant raises no issue with his convictions for aggravated assault or for employing a firearm during the attempted commission of a dangerous offense.  He also does not raise any issue with respect to his sentence for any conviction.  As such, we do not address these issues further.  *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

and to view the credited testimony in a light most favorable to the State. *State v. McKinney*, 669 S.W.3d 753, 772 (Tenn. 2023). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotation marks and citation omitted).

### 2.    First Degree Murder and Attempted First Degree Murder

As charged in this case, first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2018). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). As charged in this case, the offense of attempted first degree murder is committed when a person acts with the intent to commit premeditated first degree murder and "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* § 39-12-101(a)(2); *State v. Wooten*, No. W2022-00315-CCA-R3-CD, 2022 WL 16919957, at *6 (Tenn. Crim. App. Nov. 14, 2022), *perm. app. denied* (Tenn. Mar. 8, 2023).

> Our General Assembly has defined "premeditation" as being
>
> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (subsequently amended). Like any other element of an offense, "the State must prove premeditation beyond a reasonable doubt." *Miller*, 638 S.W.3d at 159.

The question of "[w]hether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). As our supreme court has observed,

7

Several factors are considered to infer premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Additional considerations include a lack of provocation on the victim's part and a defendant's failure to render aid to a victim.

*State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017) (internal citations omitted). "[I]n determining the existence of premeditation, the trier of fact 'may not engage in speculation.'" *State v. Reynolds*, 635 S.W.3d 893, 918 (Tenn. 2021) (quoting *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005)). That said, "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." *Davidson*, 121 S.W.3d at 614-15.

### 3. Premeditation

In this case, the jury heard from expert witnesses offered by each party as to the Defendant's mental state at the time of the offense. The Defendant offered the testimony of Dr. Caruso, who testified that the Defendant was suffering from Bipolar I disorder and was in the midst of a manic episode on September 25, 2019. Dr. Caruso also testified that this manic episode prevented the Defendant from being able to act sufficiently free from excitement and passion.

In response, the State offered the testimony of Dr. Fouche, who disagreed with Dr. Caruso's diagnosis of Bipolar I disorder. Instead, she diagnosed the Defendant as having generalized anxiety disorder and major depressive disorder. Dr. Fouche testified that, based on her evaluations of the Defendant, he did not lack the capacity to form premeditation at the time of the offenses.

In reviewing the legal sufficiency of the evidence, the law requires us to accredit the testimony of the State's witnesses, such as Dr. Fouche. *Shackleford*, 673 S.W.3d at 250. It requires us to discard any countervailing evidence, such as Dr. Caruso's conflicting testimony. *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021). It also requires us to resolve all conflicts in favor of the State's theory and to view the credited testimony in a light most favorable to the State. *McKinney*, 669 S.W.3d at 772. Looking at the evidence through the lens of the proper standard of review, it is clear that the jury credited Dr. Fouche's testimony over Dr. Caruso's conflicting testimony, as it was privileged to do. *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002) ("The weight and value to be given expert

testimony is a question for the jury. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." (citation omitted)). Dr. Fouche's opinion provided sufficient proof from which a reasonable juror could have concluded that the Defendant could form premeditation and act independently from excitement or passion.

The record also contains sufficient evidence from which a reasonable juror could conclude that the Defendant acted with premeditation in the murder of Mr. Almaraz and the attempted murder of Mr. Ramirez. Viewing the evidence in a light most favorable to the State, the proof shows that the Defendant shot Mr. Almaraz in the face at close range, and Mr. Almaraz died about two weeks later from complications of the wound. Likewise, the Defendant also shot Mr. Ramirez in the face at close range. In a statement later given to law enforcement, the Defendant admitted that he decided to shoot Mr. Ramirez before they left the Scottish Inns because Mr. Ramirez had challenged "his manhood." The Defendant asked for a ride away from the Scottish Inns so that he could shoot both victims. The Defendant also said that he shot Mr. Almaraz because he "couldn't leave a witness." After the shootings, the Defendant displayed disregard for his victims by failing to render aid or summon help, and he left the scene to walk back to the Scottish Inns. Under the deferential standard of review, we conclude that a reasonable juror could have found the element of premeditation beyond a reasonable doubt.

The Defendant argues vigorously that the trial court improperly allowed the State to cross-examine Dr. Caruso about his consideration of the October Shooting and that without this inadmissible evidence, no reasonable juror could have found the Defendant guilty. We respectfully disagree. Even if this evidence were improperly admitted—and it was not, as we discuss below—the law is clear that the legal sufficiency of the evidence "must be examined in light of *all* the evidence presented to the jury, including that which is improperly admitted." *State v. Long*, 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000) (citing *Lockhart v. Nelson*, 488 U.S. 33, 41-42 (1988); *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)) (emphasis added).

As such, on our review here, we may not simply view the evidence as if the jury had not heard the entirety of Dr. Caruso's cross-examination, including references to the October Shooting. Instead, we view *all* of the evidence in the light most favorable to the State. *State v. Sharp*, 327 S.W.3d 704, 713 (Tenn. Crim. App. 2010) ("[W]e point out that the United States Supreme Court has held that when a conviction is reversed due to the admittance of inadmissible evidence[,] the appellate court must still consider the evidence in question when determining whether the evidence was sufficient to support [t]he conviction."). In so doing, we conclude that a reasonable juror could find all of the elements of first degree murder and attempted first degree murder beyond a reasonable

9

doubt, including the element of premeditation. The Defendant is not entitled to relief on this issue.

## B. CROSS-EXAMINATION OF THE DEFENSE EXPERT ABOUT THE OCTOBER SHOOTING

The main dispute at trial centered on the Defendant's mental state at the time of the offenses. Both parties presented expert proof as to the Defendant's ability to form premeditation and act sufficiently free from excitement or passion. During his direct examination, Dr. Caruso opined that the Defendant could not form premeditation on September 25, 2019, because he was in the midst of a manic episode. On cross-examination, the State questioned Dr. Caruso about whether and to what extent the October Shooting affected his opinion about the Defendant's earlier mental state.

The Defendant asserts that the trial court committed plain error by permitting any questioning that mentioned the October Shooting because the risk of prejudice to the jury outweighed its probative value in violation of Tennessee Rule of Evidence 404(b). Further, he contends that this error violated a clear and unequivocal rule of law, that it deprived him of a fair trial, and that reversal is necessary to do substantial justice.

The State responds that the Defendant has failed to show that he is entitled to plain error relief. It asserts that the trial court did not breach a clear and unequivocal rule of law, that no substantial right was adversely affected, and that consideration of this issue is not necessary to do substantial justice. We agree with the State.

### 1. Standard of Appellate Review

"Before a defendant may raise an issue on appeal as the basis for seeking a new trial, the defendant must present the issue to the trial court in a timely, written motion for a new trial." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *2 (Tenn. Crim. App. Oct. 30, 2023) (citations omitted), *no perm. app. filed*. Except for issues related to the sufficiency of the convicting evidence and sentencing, the failure to file a timely motion for a new trial waives plenary review of all issues on appeal that could have resulted in a new trial. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). In that circumstance, a defendant may obtain relief, if at all, under the standards governing plain error review. *See Howard v. State*, 604 S.W.3d 53, 62 (Tenn. 2020).

In this case, the Defendant objected to the scope of Dr. Caruso's cross-examination at trial. However, the Defendant filed his motion for a new trial some seventy-four days after the judgment and well past the thirty-day deadline imposed by Tennessee Rule of

Criminal Procedure 33(b). Because the motion for a new trial was untimely, it was a nullity and did not preserve this issue for plenary review. *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004) ("If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing."). As such, the Defendant may obtain relief, if at all, under the standards governing plain error review. Both parties agree with this conclusion.

Our supreme court has recognized that "[u]nlike plenary review, which applies to all claims of error that are properly preserved, plain error review is limited to those errors which satisfy five criteria." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020). These criteria are as follows:

(a)     the record must clearly establish what occurred in the trial court;

(b)     a clear and unequivocal rule of law must have been breached;

(c)     a substantial right of the accused must have been adversely affected;

(d)     the accused did not waive the issue for tactical reasons; and

(e)     consideration of the error is "necessary to do substantial justice."

*See, e.g.*, *State v. Jones*, 589 S.W.3d 747, 762 (Tenn. 2019). Whether plain error exists "must depend upon the facts and circumstances of the particular case." *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). Even then, however, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial," *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994), and only "rarely will plain error review extend to an evidentiary issue." *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (citation omitted).

Importantly, the "defendant bears the burden of establishing all of these elements." *State v. Linville*, 647 S.W.3d 344, 354 (Tenn. 2022). As such, an appellate court "need not consider all of the elements when it is clear from the record that at least one [of] them cannot be satisfied." *Reynolds*, 635 S.W.3d 931. "Whether the plain error doctrine has been satisfied is a question of law which we review de novo." *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2016).

11

### 2.      Breach of Clear and Unequivocal Rule of Law

The Defendant first argues that the trial court violated a clear and unequivocal rule of law when it allowed the jury to hear testimony regarding the October Shooting. He asserts that the evidence was inadmissible under Tennessee Rule of Evidence 404(b) because the risk of prejudice was too great given the similarities between the two shootings. We respectfully disagree.

### a.      Tennessee Rule of Evidence 705

On the morning of the trial, the State sought a ruling from the trial court that it be permitted to cross-examine Dr. Caruso about his consideration of the October Shooting. The State argued that it was permitted to ask questions about the October Shooting pursuant to Tennessee Rule of Evidence 705.

Rule 705 states that "[t]he expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." The extent of permissible disclosure of information on cross-examination is broader than what may be shared on direct examination under Rule 703. *See* Neil P. Cohen, et al., *Tennessee Law of Evidence* § 7.05[3] (6th ed. 2011) ("While there are limits on the sharing of [an expert's] underlying facts on direct examination, their disclosure can be required on cross-examination by Rule 705."). As our Court of Appeals has observed,

> [O]nce an expert has given an opinion, he or she may be vigorously cross-examined to undermine the evidentiary weight of the opinion. Opposing counsel should be given broad latitude in their cross-examination. Thus, cross-examination may be used to require an expert to disclose and explain the facts or data upon which his or her opinion is based. Just as an expert may be cross-examined regarding the facts or data he or she considered, an expert may be also cross-examined regarding the facts or data that he or she did not consider and the reasons for not considering these facts or data.

*Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 197 (Tenn. Ct. App. 2008) (citations omitted), *perm. app. denied* (Tenn. Aug. 25, 2008); *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001) ("Once the evidence [of the expert's opinion] has been admitted, the defense is given broad latitude to test the validity of the expert's opinion on cross[-]examination.").

Importantly, the disclosure of a defendant's "prior bad acts" is not categorically exempt from disclosure under Rule 705 when those acts are considered by an expert in forming an opinion. On the contrary, Rule 705 "allows the prosecution to impeach the expert's diagnosis by inquiring into any of the defendant's prior bad acts contained in reports relied on by the expert in evaluating the defendant." *See State v. Thacker*, 164 S.W.3d 208, 228 (Tenn. 2005); *State v. Holloway*, No. E2004-00882-CCA-R3-CD, 2005 WL 1981791, at *11 (Tenn. Crim. App. Aug. 16, 2005) ("We agree with the trial court that the purpose of questioning Dr. Smith about the prior bad acts of the Appellant was not to show conformity with a character trait. Rather, the information was elicited from Dr. Smith to challenge his diagnosis of the Appellant." (citing Tenn. R. Evid. 705)), *perm. app. denied* (Tenn. Feb. 26, 2007).

However, special considerations arise when the impeaching evidence involves a defendant's other crimes, wrongs, or acts. In *State v. Hall*, 958 S.W.2d 679, 712 (Tenn. 1997) (appendix), our supreme court affirmed a decision from this court recognizing that other-act evidence may be admissible to impeach the credibility of an expert witness under Rule 705. However, this evidence is nevertheless inadmissible where the danger of unfair prejudice outweighs its probative value for impeachment. *See id.* ("As discussed earlier, Rule 404(b), Tenn. R. Evid., deals with the admission of prior bad acts of the defendant. . . . We conclude that the prior bad acts contained in the investigator's report upon which Dr. Meyer, in part, based his evaluation of the defendant were admissible to impeach the doctor's diagnosis and that the danger of their prejudicial effect did not outweigh their probative value."); *see also State v. Sheffield*, 676 S.W.2d 542, 553 (Tenn. 1984) ("It is permissible to allow reasonable latitude for testing the basis of an expert opinion but when that involves the use of otherwise inadmissible and highly prejudicial evidence, the trial judge must balance the probative value of the proffered evidence against the prejudicial effect upon defendant.").[2] Of course, "[t]he underlying facts and data that are elicited during the cross-examination of the expert are not admitted as substantive evidence. They are admitted for the limited and independent purpose of enabling the jury to scrutinize the expert's reasoning." *See State v. Hodges*, No. 01C01-9212-CR00382, 1995 WL 301443, at *16 (Tenn. Crim. App. May 18, 1995) citation and internal quotation marks omitted), *aff'd*, 944 S.W.2d 346 (Tenn. 1997).

---

[2] Aside from evidence of other crimes, wrongs, or acts, evidence admitted for the limited purpose recognized by Rule 705 may still be excluded if its probative value for impeachment is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

### b.     Tennessee Rule of Evidence 404(b)

To that end, the parties disagree about the admissibility of the October Shooting under Tennessee Rule of Evidence 404(b).  This rule provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:

1.     The court upon request must hold a hearing outside the jury's presence;

2.     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

3.     The court must find proof of the other crime, wrong, or act to be clear and convincing; and

4.     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Generally, a trial court's decision to exclude or admit evidence will not be disturbed absent an abuse of discretion.  *Thacker*, 164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997)).  "However, when we consider evidence that implicates Tenn. R. Evid. 404(b), we review the trial court's admissibility ruling de novo unless the trial court substantially complied with the procedures outlined in Rule 404(b)."  *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014).  As such, "[i]f the trial court substantially complied with Tenn. R. Evid. 404(b), we will overturn the ruling only if the trial court abused its discretion."  *Id.* (citing *State v. Kiser*, 284 S.W.3d 227, 288-89 (Tenn. 2009)).  "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence."  *Reynolds*, 635 S.W.3d at 921 (citation and internal quotation marks omitted).

In this case, the trial court substantially complied with the procedural requirements of Rule 404(b). It held a jury-out hearing as requested by the State. The court determined that the Defendant's mens rea and ability to form premeditation were relevant and material issues in the case. It concluded that clear and convincing evidence existed to show the Defendant's involvement in the October Shooting. It also found that because Dr. Caruso had testified at a pretrial hearing that he considered the October Shooting in forming his opinion, the probative value of the evidence outweighed the risk of unfair prejudice. As such, we review the trial court's decision allowing the State to cross-examine Dr. Caruso about his consideration of the October Shooting for an abuse of discretion.

Even though the trial court complied with the procedural requirements of Rule 404(b), the Defendant asserts that the timing of the trial court's decision forced him "to open Pandora's box without a full understanding of the consequences[.]" More specifically, he argues that he was forced "to litigate not just the allegations underpinning this case, but also defend himself against allegations of a second, identical shooting for which he was not on trial." We respectfully disagree.

Before trial, the State filed a motion in limine for the trial court to determine the admissibility of Dr. Caruso's testimony. During Dr. Caruso's testimony during the motion hearing, he testified that he had considered the October Shooting in reaching his opinion on the Defendant's mental state. Based on that answer, the State argued that it intended to impeach Dr. Caruso regarding the October Shooting during cross-examination thereby, putting the Defendant on notice to anticipate this issue to be litigated during trial. Although the Defendant now asserts that he was "required to open Pandora's box," he knew that his expert had considered the October Shooting in his own analysis and that the State was seeking to ask about that consideration. By calling Dr. Caruso at trial, the Defendant did indeed open Pandora's box, but he did so voluntarily. He may not now argue that his hand was forced by the trial court when his expert witness was cross-examined about information he considered in forming an opinion.

More importantly, the Defendant does not assert that the trial court failed to properly analyze whether the testimony was admissible pursuant to Rule 404(b); he simply disagrees with the trial court's determination that the probative value of the evidence outweighed the potential prejudice. However, the abuse of discretion standard of appellate review is important to our analysis. When reviewing a trial court's decision for an abuse of discretion, we must have "awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). To that end, we may not "second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that [we] would not have chosen." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019). We also may not substitute our judgment for that of the trial court simply because we believe that another choice would have been the "best decision." *State v. Willis*, 496 S.W.3d 653, 729 (Tenn. 2016).

Although it is possible that others could reach a different conclusion, the trial court's decision here was not illogical, nor was it unreasonable. To the contrary, the court identified and applied the correct standard of law, made findings that have support in the record, and made a reasoned choice between acceptable alternatives. As such, even if "reasonable minds can disagree with the propriety of the decision," we conclude that the trial court acted within its discretion to allow the State to cross-examine Dr. Caruso regarding the effect of the October Shooting on his analysis of the Defendant's ability to form premeditation. *McCaleb*, 582 S.W.3d at 186.

Respectfully, the Defendant's disagreement with the trial court's discretionary decision does not constitute a breach of a clear and unequivocal rule of law. Because the Defendant has not established this factor essential to plain error relief, we affirm the trial court's judgments.

## CONCLUSION

In summary, we hold that the evidence was sufficient to sustain the Defendant's convictions for first degree murder and attempted first degree murder. We further hold that the trial court did not commit plain error in permitting the Defendant's expert witness to be cross-examined about other-acts evidence he considered when forming an opinion about the Defendant's ability to form premeditation. Accordingly, we respectfully affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE